Shaw C. J.
delivered the opinion of the Court. The questions whether the plaintiff was duly employed by the selectmen to repair the clock in question, and whether he did repair it, and the reasonableness of the charge for performing this service, have been settled by the jury in favor of the plaintiff, and the only remaining question is, whether the town in its corporate capacity stands legally responsible for the payment of this charge.
1. The first objection is, that the support of a public clock is not one of the objects of municipal concern and jurisdiction, and that a town as such, has no authority to provide for the support of a public clock, and assess the expense thereof upon the citizens.
The law upon this subject is laid down with great clearness, and with as much accuracy and precision perhaps as the subject would admit, in Stetson v. Kempton, 13 Mass. R. 272. The nature and purposes of this species of corporations, (towns and parishes,) are set forth, and the general principle declared, that these corporations have no power to levy taxes and assess money upon the inhabitants, for general or indefinite purposes, but only so far as the same may be necessary to enable them to exercise the powers, enjoy the privileges and perform the duties, established by law. The general authority to raise money, is contained in St. 1785, c. 75, § 7, which is itself a revision and reenactment of an earlier law, which provides that towns may “ grant and vote such sum and sums of money as they shall judge necessary for the settlement, maintenance and support of the ministry, schools, the poor, and other necessary *234 charges, arising within the same town. ’ It seems very char that this statement was not intended to be an enumeration of objects and purposes for which towns may raise money, but the expression of a few leading and prominent objects, by way of instance, and a general reference to others, under the term “other necessary charges.” This is obvious from the consideration, that it omits several very important objects, which are expressly placed within the jurisdiction of towns by law, as highways and bridges, prosecution and defence of suits, pounds, and many others. And this is the construction put upon the statute in the case of Stetson v. Kempton. Several cases are there enumerated, not mentioned in the statute. Among others it is stated, “ the erection of public buildings for the accommodation of the inhabitants, such as town houses to assemble in and market houses for the sale of provisions, may also be a proper town charge and may come within the fair meaning of the term necessary ; for these may be essential to the comfort and convenience of the citizens.” This last phrase shows the difficulty of prescribing a precise and definite practical rule, with its necessary restrictions ; and I presume from the general reasoning of the Court in that case, the Court itself would hardly be prepared to say that towns might levy taxes and assess money upon the inhabitants for the accomplishment of all objects essential to the comfort and convenience of the citizens. But the difficulty is intrinsic, and arises from the manner in which these anomalous bodies, from slight beginnings have grown up to be strict aggregate municipal corporations, possessing many of the characteristics of cities and boroughs. The colonial ordinance, reciting that whereas particular towns have many things which concern only themselves and the ordering their own aiTairs and disposing of business in their own town, provides for the election of various officers, and then authorizes them to make such laws and constitutions as may concern the welfare of their town, provided they be not of a criminal, but of a prudential nature. Anc. Charters, 195. It is manifest, that this deals entirely in loose generalities ; and such legislation can only be accounted for by reference to the simplicity of the times, the singleness of purpose on the part of the government and their general confidence in the discre* *235 tion and good intention of the citizens, and more especially from the difficulty of foreseeing what the exigencies of such a new and untried state of society might require. The difficulty of indefiniteness was not much relieved by the provincial statute of 1692, (Anc. Charters, 249,) by which freeholders in town-meeting, among other things were “ empowered from time to time to make and agree upon such necessary rules, orders and by-laws for the directing, managing and ordering the prudential affairs of such town, as they shall judge most conducing to the peace, welfare and good order thereof,” &c. And the revised statute already cited, (Si. 1785, c. 75, § 7,) immediately after the clause authorizing the grant and assessment of •money, provides, that towns are empowered to make and agree upon such necessary rules, orders and by-laws, for the direct ing, managing and ordering the prudential affairs of such town,, as they shall judge most conducive to the peace, welfare and good order thereof, not repugnant to the general laws of the government.
After all, the question recurs, what are the prudential concerns of a town ; and perhaps no better approximation to an exact' description can be made, than to say that it embraces that large class of miscellaneous subjects affecting the accommodation and convenience of the inhabitants, which have been placed under the municipal jurisdiction of towns, byr statute or by usage. Many such subjects will probably occur to the recollection of those who are conversant with the proceedings of towns, as unquestionably within the jurisdiction of towns, in respect to which there are no statute provisions ; such as public hay scales, burying grounds, wells and reservoirs, and many others. A provision for one or more public clocks for the common regulation of time, seems to be an object of common convenience and necessity, in all large towns and populous villages ; and the power to provide for them seems not only to be incidental to the proper execution of several powers expressly given to them, as the regulation of schools to which time is important, but we are all of opinion, that it is warranted by long usage and practice. It is not, as in the case cited, an expense incurred in respect to a subject placed by the constitution and laws in other hands. When therefore a town shall *236 think fit to provide a public clock, as a charge upon the corporation, they have authority to assess the cost thereof upon the inhabitants, as a necessary charge arising within the same town.[1]
2. Another objection was, that the selectmen were not duly authorized to make the large and extensive repairs, which were made on this clock.
It appears to us that this objection is answered by the vote of the town of the 15th of March 1827, by which the town referred it to the selectmen as well to determine what repairs should be made on the several town clocks, as to have them made. The clocks were procured by subscription, and as early as 1806 the town passed votes providing for the care and regulation of them, as well as for the repairs. This was an ■ expression of the will of the town, to assume the care of these clocks as a public charge, no doubt in consideration of the public convenience to be derived from them. The town having thus long had the benefit of these clocks, a vote authorizing the selectmen to make the necessary repairs, must be construed according to the subject. The particular clock in question had stood many years, and was necessarily taken down, because the church in which it stood was taken down. The general authority to make all necessary repairs, could not be considered as restricted to the small repairs formerly made, because on these former occasions no such extensive repairs were necessary. ■ It appears that the clock had been sent to the plaintiff for examination, and that he had made an estimate of the expense of the repairs before March 1827, and it was either known or might have been easily ascertained what the necessary expense would be. If the town intended to impose any restrictions upon the authority of the selectmen, as to cost or otherwise, they should have been expressed in the vote.
3. The last objection, that the selectmen had no right to delegate their authority to make a contract for these repairs, seems not to be supported by the facts. It appears that, after *237 the selectmen had been informed of the plaintiff’s estimate and terms, they consulted together, and determined to have the plaintiff proceed to make the repairs. This constituted the contract. Whether the act of the plaintiff is to be deemed an offer, which the selectmen in behalf of the town accepted ; or whether this was an original order and request from the selectmen, which the plaintiff executed by making the repairs ; in either view it is a contract, made by them as a body.

Judgment on the verdict.

 See Parsons v. Goshen, 11 Pick. 396; Spaulding v. Lowell, 23 Pick. 71 ; Anthony v. Adams, 1 Metc. 286; Allen v. Taunton, 19 Pick. 485; Bancroft v. Lynnjield, 18 Pick. 566; Keyes v. Weslford, 17 Pick. 273; Simmons v. Hanover, 23 Pick. 188; Hooper v. Emery, 2 Shepl. 375.